UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STUDENT ADVANTAGE FUND I LLC, | **COMPLAINT** |
| Plaintiff, | Civil Action No.: |
| -against- | |
| KENNEDY LEWIS MANAGEMENT LP, | |
| Defendant. | |

Plaintiff STUDENT ADVANTAGE FUND I LLC ("SAF"), by and through its undersigned attorneys, Wilson Elser Moskowitz Edelman & Dicker, LLP, alleges as follows:

**INTRODUCTION**

1.      This action arises from Defendant Kennedy Lewis Management LP's willful breach of contract, and other malicious tortious acts aimed at unlawfully usurping SAF's business.  In late 2017, SAF approached KLM about investing in SAF's business, which KLM acknowledged was unique and potentially lucrative.  The parties entered into an agreement that would allow SAF to share its proprietary business model, knowledge of the relevant marketplace, and list of clients and prospective clients without fear of theft by KLM.  But instead of investing in SAF, KLM stole SAF's proprietary information and is now attempting to develop a competing business with one of SAF's primary competitors—using SAF's own proprietary information.

2.      In response to KLM's unlawful acts, SAF brings this action for: (i) misappropriation of trade secrets pursuant to the Defense of Trade Secret Act of 2016, 18 U.S.C. §§ 1836, et seq, as amended by the Defense of Trade Secrets Act of 2016; (ii) breach of contract under New York law; (iii) breach of the implied covenant of good faith and fair dealing under New York law; (iv) unjust enrichment under New York law; (v) fraud under New York law; (vi)

unfair competition under New York law; and (vii) intentional interference with business relationships under New York law.

3.      SAF is a limited liability company duly organized under the laws of the State of Delaware, with an address at 160 Greentree Drive, Suite 101, Dover, Delaware 19904.

4.      Upon information and belief, Kennedy Lewis Management LP ("KLM") is organized in the State of Delaware, with a principal place of business located at 80 Broad Street, 22nd Floor, New York, New York 10004.

## JURISDICTION AND VENUE

5.      Federal question jurisdiction exists under 28 U.S.C. § 1331 as this action arises under 18 U.S.C. § 1836.

6.      This Court has personal jurisdiction over KLM at least because KLM is present within, and has ongoing systematic contacts with, the State of New York.  KLM has purposefully and regularly availed itself of the privileges of conducting business in the State of New York and in the Southern District of New York.  SAF's causes of action also arise directly from KLM's activities in the State of New York and in the Southern District of New York, and KLM's unlawful acts committed within the State of New York.  In addition, KLM consented to New York jurisdiction in paragraph 7 of the parties' Confidentiality & Non-Circumvention Agreement.

7.      Venue is proper in this Court under 28 U.S.C. §§ 1391(b), (c), and (d) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

2

## FACTS COMMON TO ALL CAUSES OF ACTION

8.     SAF was formed in October 2017 to engage in the business of researching, identifying, and selecting Income Share Agreement ("ISA") investment opportunities for its clients.

9.     An ISA is a financial structure in which an individual or organization provides an educational course or degree to a student who, in exchange, agrees to pay back a fixed percentage of his/her income for a fixed number of years with a reasonable and predetermined payment cap.

10.     SAF has developed a proprietary business model wherein ISAs are utilized as an alternative to the traditional student loan system for higher education, delivering a method of education funding that maximizes efficiency and minimizes risk for students and educational institutions.

11.     SAF partnered with Leif Technologies, Inc. ("Leif"), a financial technology company with a proprietary ISA platform, to deliver its services to clients in the area of higher education.  Leif's software provides origination, program management, and payment solutions for ISAs, while SAF arranges financing solutions for the agreements.

12.     Prior to October 26, 2017, in connection with its proprietary business model, SAF identified a number of potential clients, had already executed an ISA financing agreement with one such client, and was actively engaged in discussions with many additional clients with the aim of expanding SAF's reach to the entire post-secondary education industry, as well as other business use cases in other industries.

9671323v.1

13.     In support of its growth goals, SAF began to seek out investors in mid-October 2017. Through a mutual acquaintance, SAF was introduced to KLM by Darren Richman, a partner at KLM.

14.     An initial meeting between SAF and KLM was held on October 26, 2017 at KLM's offices in downtown New York.

15.     Upon information and belief, at the time of the October 26, 2017 meeting, KLM had only recently been launched by partners Darren Richman and David Chene.

16.     During the October 26, 2017 meeting, SAF explained the general structuring of ISAs, and it was apparent that the entire concept of ISAs was completely novel to both Mr. Richman and Mr. Chene.

17.     KLM expressed immediate interest in acting as SAF's investment partner and capital provider.

18.     In response to KLM's interest, SAF emailed KLM a proposed Confidentiality & Non-Circumvention Agreement on of the evening of October 26, 2017.

19.     In its October 26, 2017 email, SAF indicated that it would share its proprietary data and details of its business only upon execution of the proposed Confidentiality & Non-Circumvention Agreement.

20.     In response to SAF's October 26, 2017 email, Mr. Richman responded in an email dated October 27, 2017 at 6:24 a.m.  In his email, Mr. Richman commended SAF on "seeing this [ISA] opportunity," expressed that he was "look[ing] forward to seizing on [the opportunity] with [SAF]", and indicated that KLM would "sign the NDA today."

21.     KLM circulated a revised and executed version of Confidentiality & Non-Circumvention Agreement on October 27, 2017 at 2:47 p.m.

4

22.     SAF took no issue with KLM's revisions, and returned a fully executed copy of the Confidentiality & Non-Circumvention Agreement ("Agreement") to KLM on October 27, 2017 at 3:49 p.m. A copy of the Agreement is annexed hereto as Exhibit A.

23.     The Agreement reads, in relevant part, as follows:

**2. NON-DISCLOSURE**

(a) [KLM] agrees that the Information shall be kept confidential by [KLM] and its Representatives; and

(b) It shall not, in any manner whatsoever, disclose or disseminate the Information furnished to it by or on behalf of [SAF] to any other person or entity, provided, however, that any disclosure of the Information may be made to its Representatives who: (a) have been advised of the obligations of confidentiality set out in this Agreement; (b) have a need to know such Information for the purpose of the Transaction; and (c) in the case of [KLM]'s contractors, have signed a confidentiality agreement with [KLM] that would apply to the information which includes provisions substantially similar to those of this Agreement;

(c) in accordance with a judicial, government or regulatory order, provided [KLM] shall give [SAF] reasonable prior notice of such disclosure and shall comply with any applicable protective order or equivalent that applies to the disclosure; or

(d) subject to clauses (a) through (c) above, to any other person or entity upon the prior written consent of [SAF].

…

**4. NON-CIRCUMVENTION**

[KLM] and its Representatives shall not circumvent [SAF] with respect to any inquiries, negotiations, offers or commercial dealings concerning any transaction, business dealing or negotiations with any Client or Clients, prospective Clients or business contacts of [SAF], with any person or entity of whom [KLM] and its Representatives may become aware of as a result of [SAF]'s introduction, or with any transaction, business dealing or negotiation of which [KLM] and its Representative may become aware of as a result of [SAF]'s disclosure, without the express written consent of [SAF]. At all times during the term of this Agreement and for a period of two (2) years after the termination

of this Agreement, [KLM] and its Representatives shall not, whether directly or indirectly, solicit parties identified by [SAF] for purposes of confirming or inquiring about information provided by [SAF] nor to seek additional information, nor to engage in any financial, investment or commercial activity of a similar nature to the services rendered by [SAF]. [KLM] further agrees not to take or allow to be taken any action during the term of this Agreement that has the effect of circumventing the terms of this Agreement, it being the intent of the Parties that each abide by both the letter and spirit of the terms of this Agreement.

…

## 10. MISCELLANEOUS

(a) [KLM] acknowledges that money damages would not be a sufficient remedy for any breach of this Agreement, and accordingly, in the event of any such breach or threatened breach, [SAF] shall be entitled to equitable relief, including an injunction or specific performance, in addition to any other remedies available to it at law or in equity.

…(h) If either party brings an action to enforce the terms of this Agreement or to declare rights hereunder, the prevailing Party in any such action, on trial or appeal, shall be entitled to its expenses, including but not limited to reasonable attorneys' fees and court costs, to be paid by the losing Party as fixed by the court.

24.     In reliance on the Agreement, SAF revealed its proprietary trade secret information to KLM in order to enable KLM to assess the value of its potential investment in SAF.

25.     KLM never terminated the Agreement.  To this date, the Agreement remains in full force and effect.

26.     In particular, SAF disclosed its proprietary business model, its existing customer list, its list of targeted customers, and its proprietary research about the marketplace which identified potential business partners and competitors.

27.     Throughout November 2017, the details of SAF's business were disclosed to KLM in an incredibly high level of detail in person, via email, and through a shared Dropbox folder, and always with the expectation that these disclosures were protected by the Agreement.

28.     For example, SAF provided KLM with "pitch decks" and financial models, and explicitly explained how to successfully pitch ISAs in the higher education marketplace.  Upon information and belief, KLM used the confidential information learned from SAF to pitch the ISA strategy to external investors and raise capital for KLM's fund.

29.     In addition, one of SAF's client relationships, which SAF had been cultivating since March 2017, was specifically disclosed to KLM as being a cornerstone of SAF's business plan.

30.     SAF also provided KLM with periodic updates of its meetings and conversations with SAF's clients and prospective clients.

31.     For example, on November 17, 2017, SAF disclosed two prospective deals that SAF valued at approximately $60 million dollars.

32.     Likewise, SAF provided KLM with a detailed overview of its exact business model, which was later memorialized in an email between KLM and SAF on November 21, 2017.

33.     Upon information and belief, once KLM became privy to SAF's business model, customer list, and target clients, KLM began to develop a strategy to misappropriate SAF's assets and steal its business.

34.     KLM sent an initial Term Sheet on November 4, 2017 related to KLM's anticipated investment in SAF and Leif.

35.     Subsequently, KLM circulated numerous revised iterations of the Term Sheet throughout November and December 2017, consciously and repeatedly making unreasonable changes to the Term Sheet, all the while continuing to probe SAF for more and more detailed written summaries of SAF's business model and strategies.

36.     Upon information and belief, KLM's requests for additional written summaries of SAF's business model and strategies in December 2017 were not part of a bona fide exercise in due diligence directed at making an investment in SAF, but were instead designed to force SAF to painstakingly catalogue all the information KLM would need to co-opt SAF's business.

37.     On December 31, 2017, a final diligence call between KLM and SAF's attorney was held in which the final details of the Term Sheet were agreed upon in principal.

38.     Then, on January 10, 2018, KLM abruptly and without warning rescinded the latest iteration of the Term Sheet, and terminated further discussion of consummating an investment with SAF.

39.     Upon information and belief, it was at this time that KLM reached out to SAF's competitor Vemo Education ("Vemo") to develop a business venture to compete directly with SAF, using SAF's proprietary knowledge and customer lists.

40.     KLM only learned of Vemo's existence through proprietary information shared by SAF pursuant to the Agreement.

41.     Upon information and belief, KLM's relationship with Vemo is meant to directly replicate SAF's partnership with Leif, i.e. Vemo's software provides origination, program management, and payment solutions for ISAs, while KLM arranges financing solutions for the agreements.

42.     After KLM misappropriated SAF's business model, KLM then proceeded to solicit SAF's customers.

43.     In April 2018, KLM and Vemo arranged a meeting with one of SAF's primary clients,[1] with whom SAF had already executed an ISA financing agreement.

44.     Upon information and belief, this April 2018 meeting was designed with the express intention of interfering with SAF's relationship with its client, which SAF values at approximately $50 million dollars.

45.     KLM only learned of this aforementioned client's existence, and the prospective value of targeting this client, through proprietary information shared by SAF pursuant to the Agreement.

46.     Then, in October 2018, KLM targeted another of SAF's prospective clients, causing SAF to lose out on that relationship valued at approximately $50 million dollars.

---

[1] SAF will not expressly name its clients and prospective clients herein in order to prevent further dissemination of SAF's proprietary information.

9671323v.1

47.     KLM only learned of this second client's existence, and the prospective value of targeting this client, through proprietary information shared by SAF pursuant to the Agreement.

48.     In December 2018, KLM targeted another of SAF's prospective clients, causing SAF to lose out on that relationship valued at approximately $50 million dollars.

49.     KLM only learned of this third client's existence, and the prospective value of targeting this client, through proprietary information shared by SAF pursuant to the Agreement.

50.     In January 2019, KLM began efforts to contract with another of SAF's prospective clients, causing SAF to lose out on that relationship valued at approximately $20 million dollars.

51.     KLM only learned of this fourth client's existence, and the prospective value of targeting this client, through proprietary information shared by SAF pursuant to the Agreement.

52.     SAF had been cultivating this fourth client since March 2017, and SAF's potential deal with the client was explicitly disclosed to KLM via email on November 17, 2017.

53.     Upon information and belief, when KLM breached the Agreement by approaching this fourth client, KLM used a proposed financing term sheet based directly on a proposed structure disclosed by SAF to KLM regarding this client.

54.     Upon information and belief, KLM continues to target additional clients and prospective clients of SAF using SAF's proprietary information.

55.     KLM has blatantly circumvented and copied SAF's business through KLM's partnership and direct investment into SAF's competitor Vemo.

56.     KLM has blatantly circumvented and copied SAF's business by targeting SAF's clients and prospective clients, which were revealed to KLM pursuant to the Agreement.

9671323v.1

57.     Upon information and belief, KLM continues to raise money on its investment fund under an explicit mandate and allocation to ISAs, demonstrating a concerted effort to target the ISA market in direct competition with SAF, all while exploiting SAF's proprietary information.

58.     On January 29, 2019, counsel for SAF sent a letter to KLM reminding KLM of its obligations under the Agreement, and directing KLM to cease its brazen violation of the Agreement and other tortious acts.

59.     In response, on January 30, 2019, KLM attempted to contact another of SAF's potential clients for information.  KLM had first been introduced to this potential client by SAF at a meeting held at KLM's offices on December 4, 2017.

60.     SAF's counsel sent a second letter to KLM on January 30, 2019 advising that SAF considered this continued outreach to SAF's prospective clients and business contacts to represent a further breach of the Agreement.

61.     On February 6, 2019, KLM responded to SAF's counsel's letters by indicating that KLM did not intend to cease its infringing conduct.

62.     The Agreement is still in effect to this date and, by its express terms, shall subsist for a period of two years after its termination.

## FIRST CAUSE OF ACTION – FEDERAL DEFENSE OF TRADE SECRET ACT 18 U.S.C. § 1836, et seq.

63.     SAF realleges and incorporates by reference paragraphs 1 through 62 above as if set forth fully herein.

64.     SAF maintains its principal place of business in New York.  SAF has been providing services and intending to provide its services to prospective clients across the United States.  Therefore, SAF has provided its services in interstate commerce.

9671323v.1

65.     SAF maintains its proprietary information, consisting of its customer lists, its prospective customer lists, its business model, and its business strategy, in strictest confidence.

66.     SAF made reasonable efforts to protect its trade secrets, including but not limited to the use of the Agreement.

67.     SAF's trade secrets derive independent economic value from not being generally known to or readily ascertainable through proper means by another person or party.

68.     SAF revealed its proprietary information to KLM in reliance upon the protections afforded to SAF pursuant to the parties' Agreement.

69.     KLM has used SAF's confidential and proprietary information to solicit clients, partner with competitors and replicate SAF's business model in direct competition with SAF.

70.     When KLM used SAF's proprietary information to solicit clients, partner with competitors and replicate SAF's business model, KLM knew the information was protected and that KLM had a duty to maintain the secrecy of SAF's trade secrets.

71.     Upon information and belief, KLM shared SAF's trade secrets with its competitor, Vemo.

72.     Upon information and belief, KLM is willfully and improperly using SAF's proprietary information and intends to use SAF's trade secrets for its own financial benefit.

73.     SAF has not expressly or impliedly consented to KLM's use or disclosure of SAF's trade secrets in any way.

74.     KLM has misappropriated SAF's proprietary information that includes, but is not limited to, business and financial information.

75.     SAF has been damaged by KLM's misappropriation and are entitled to its actual losses, damages for KLM's unjust enrichment, exemplary damages, and attorneys' fees.

12

## SECOND CAUSE OF ACTION – BREACH OF CONTRACT

76.    SAF realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs 1 through 75 as if fully set forth herein.

77.    The Agreement is a valid contract between SAF and KLM.

78.    The Agreement was, at all times relevant, in full force and effect, and the Agreement remains in full force and effect to this date.

79.    SAF performed all of its obligations under the Agreement. For example, SAF exchanged knowledge regarding its proprietary business model and customer lists in exchange for KLM's promise that it would keep all such information as confidential and not circumvent SAF in the ISA marketplace.

80.    KLM, however, breached its obligations under the Agreement. For example, KLM failed to keep information received from SAF pursuant to the Agreement as confidential, and used such information for purposes other than evaluating an investment in SAF.  Instead, KLM has used SAF's confidential information to engage with SAF's competitors to compete with SAF in the ISA marketplace.

81.    KLM wrongfully contacted and entered into deals with SAF's customers and prospective customers without permission from SAF.

82.    SAF has been damaged by KLM's breaches because KLM disclosed SAF's confidential information to third parties, and utilized SAF's confidential information to circumvent SAF and to target SAF's proprietary customer lists in direct competition with SAF.

83.    SAF is entitled to an award of damages in an amount to be determined at trial, plus interest, and the legal fees and costs for enforcement of this action.

9671323v.1

## THIRD CAUSE OF ACTION – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

84.     SAF realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs 1 through 83 as if fully set forth herein.

85.     The Agreement is valid, binding, certain, and agreed-to by SAF and KLM.

86.     Implied in all contracts, including the Agreement, is a covenant of good faith and fair dealing which obligates the parties to act in good faith, to use their best efforts to deal fairly with one another, and to do nothing that will impede the other party from obtaining the benefits of the contract.

87.     SAF performed all conditions precedent to enforcing the Agreement, and performed according to both the letter and the intent of the Agreement.  For example, SAF provided its proprietary knowledge with the understanding that KLM would use that knowledge to assess a potential investment in SAF.

88.     Instead, KLM acted in a manner intended to deprive SAF of the right to receive the benefits of the Agreement.  The purpose of the Agreement was to enable the free exchange of information between KLM and SAF by foreclosing KLM's ability to directly compete with SAF in the ISA marketplace.

89.     Upon information and belief, KLM solicited SAF's proprietary information with the intention of misappropriating that information to compete with SAF in the ISA marketplace.

90.     KLM has, in fact, used SAF's proprietary information to compete with SAF, causing damage to SAF.

91.     SAF is entitled to an award of damages in an amount to be determined at trial, plus interest, and the legal fees and costs for enforcement of this action.

## FOURTH CAUSE OF ACTION – UNJUST ENRICHMENT

92.     SAF realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs 1 through 91 as if fully set forth herein.

93.     SAF provided services to KLM and reasonably expected to receive a benefit for the same.   For example, SAF provided KLM with an exhaustive overview of the ISA marketplace.

94.     KLM had notice and knowledge that SAF expected to receive a benefit for the services it indisputably provided.

95.     KLM received a substantial and definite benefit from SAF's services and must provide reasonable compensation to SAF.

96.     KLM did not provide reasonable compensation to SAF for the services provided.

97.     KLM's enrichment was at the expense and to the detriment of SAF.

98.     The retention of the benefit by KLM, and the refusal to pay SAF, is unjust.

99.     The circumstances are such that in equity and good conscience, KLM should remit to SAF the value of the services rendered.

100.    KLM has been unjustly enriched in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION – FRAUD

101.    SAF realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs 1 through 100 as if fully set forth herein.

102.    Throughout October, November and December 2017, and January 2018, KLM repeatedly misrepresented material facts to SAF, including that they would, inter alia: (i) keep SAF's information confidential; (ii) not circumvent SAF to compete directly with SAF in the ISA marketplace; and (iii) not contact or communicate with the SAF's clients and prospective clients.

103.    In addition, KLM stated that it needed written summaries of SAF's business model and strategies in December 2017, but these requests were not part of a bona fide exercise in due diligence directed at making an investment in SAF, but were instead designed to force SAF to painstakingly catalogue all the information KLM would need to co-opt SAF's business.

104.    The aforesaid misrepresentations were made by KLM's principals, Anthony Pasqua, Darren Richman, Niles Chura, and David Chene both orally and in writing.

105.    In addition, on December 27, 2017, KLM employee Griffin Dan sent SAF a list of due diligence items that KLM requested SAF to prepare, and SAF prepared voluminous detailed materials about SAF's business model and strategies in response.  KLM represented to SAF that these items were needed for KLM to conduct due diligence on its investment in SAF.  Upon information and belief, KLM had already decided not to invest in SAF by December 27, 2017, and instead intended to use the detailed reports prepared by SAF to steal SAF's business.

106.    KLM knew that its representations were false when made or made those representations recklessly and without regard for their truth.

107.    KLM intended that SAF rely on its misrepresentations and SAF did actually reasonably rely on KLM's representations.

108.    SAF was harmed by the KLM's misrepresentations and those misrepresentations were a substantial factor in causing SAF's harm.

109.    As a result, SAF is entitled to an award of damages in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION – UNFAIR COMPETITION

110.    SAF realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs 1 through 109 as if fully set forth herein.

111.   SAF is the owner of trade secrets and confidential and proprietary information. Specifically, SAF owns trade secrets and confidential and proprietary information in its business model, customer lists, and knowledge of the ISA marketplace.  Those trade secrets and confidential and proprietary information are used in SAF's business and give it an opportunity to obtain an advantage over competitors who do not know or use them.

112.   KLM improperly acquired, used, and disclosed SAF's trade secrets and confidential and proprietary information, including but not limited to the misrepresentations and breaches alleged herein, and in violation of the Agreement.

113.   KLM thus misappropriated the above-referenced trade secrets and confidential and proprietary information for its own benefit and for the benefit of others.

114.   SAF's trade secrets and confidential and proprietary information had actual or potential independent economic value because they were secret.  SAF made reasonable efforts to protect its trade secrets, including but not limited through use of the Agreement.

115.   KLM's misappropriation caused SAF to be harmed and/or caused KLM to be unjustly enriched.

116.   KLM is now competing actively and directly against SAF by unfair and wrongful means that included and continue to include, among other things: (i) misappropriating and wrongfully disclosing SAF's confidential and proprietary information, and (ii) using SAF's confidential information for the purpose of diverting from SAF to KLM certain actual and/or potential business opportunities of SAF's that it would not have known but for SAF's disclosure of such information in reliance on the Agreement.

117.    As the direct and proximate result thereof, KLM will cause SAF to lose market standing, business, business opportunities, profit, and opportunities for profit that SAF would have had but for KLM's wrongful and unfair competition.

118.    As a result of the aforementioned wrongful conduct, SAF has been and will continue to be damaged in an amount to be determined at trial.

119.    SAF has no adequate remedy at law and is entitled to damages and an injunction to prevent further irreparable harm from being caused by KLM.

**SEVENTH CAUSE OF ACTION – INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONSHIPS**

120.    SAF realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs 1 through 119 as if fully set forth herein.

121.    SAF was in a business relationship with its customers and prospective customers that constituted present or future expectations of economic benefit inuring to SAF.

122.    KLM was aware of these relationships and was either introduced through SAF or had knowledge of these relationship through disclosures made by SAF.

123.    KLM was fully aware of those opportunities and SAF's expectancy therein.

124.    KLM intentionally and with malice circumvented SAF in an attempt to develop business relationships with SAF's customers and prospective customers in direct competition with SAF. By engaging in that conduct and by using improper or illegal means, KLM intended to disrupt SAF's business relationships or knew that disruption of those relationship was certain or substantially certain to occur.

125.    KLM's interference in SAF's relationships was independently unlawful and tortious in that (i) KLM fraudulently induced SAF to enter into the Agreement and to rely thereon by misrepresenting KLM's intent and willingness to refrain from direct communication

with SAF's customers and prospective customers; (ii) KLM defrauded SAF by representing that KLM needed detailed information about SAF's business model in order to assess an investment in SAF when, in fact, KLM intended to circumvent SAF and directly compete with SAF; and (iii) KLM misappropriated SAF's skill, knowledge, and labors, developed and/or expended over several years, as part of its disruption of SAF's business relationships.

126.    Specifically, upon information and belief, KLM had no intent to refrain from direct communication and solicitation of SAF's customers and prospective customers.

127.    As a result of KLM's conduct, KLM usurped SAF's business relationships, SAF's relationships with its customers and prospective customers were disrupted, and SAF was harmed.

128.    KLM's conduct was a substantial factor in harming the relationships between the SAF and its customers and prospective customers.

129.    As a result, SAF seeks recovery of damages from KLM in an amount to be determined at trial.

## EIGHTH CAUSE OF ACTION – INJUNCTIVE RELIEF

130.    SAF realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs 1 through 129 as if fully set forth herein.

131.    KLM entered into the Agreement with SAF.

132.    Under Section 4 of the Agreement, KLM covenanted, inter alia, that it would not "solicit parties identified by [SAF] for purposes of confirming or inquiring about information provided by [SAF] nor to seek additional information, nor to engage in any financial, investment or commercial activity of a similar nature to the services rendered by [SAF]."

133.    Under Section 10(a) of the Agreement, KLM expressly acknowledged that "that money damages would not be a sufficient remedy for any breach of this Agreement, and

19

accordingly, in the event of any such breach or threatened breach, [SAF] shall be entitled to equitable relief, including an injunction…"

134.   As set forth above, KLM breached the Agreement by, inter alia, (i) taking and/or using confidential information from SAF for the benefit of KLM; and (ii) soliciting or otherwise enticing SAF's customers and prospective customers to do business with KLM instead of SAF, or to discontinue their business relationships with SAF.

135.   KLM's actions have and will continue to cause SAF damages which cannot be reasonably calculated or quantified.

136.   As a result, SAF has sustained irreparable injury that cannot be adequately addressed at law.

137.   Accordingly, SAF is entitled to preliminary and permanent injunctive relief preventing KLM from: (i) utilizing SAF's confidential information; (ii) soliciting or attempting to solicit any business from any of SAF's customers or prospective customers, or soliciting or enticing any customer of SAF to discontinue, terminate, cancel or revoke its contractual relationship with SAF; and (iii) unwinding KLM's unlawful presence in the ISA marketplace until such time as the contractually agreed upon period has expired.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, STUDENT ADVANTAGE FUND I LLC, seeks judgment against Defendant, KENNEDY LEWIS MANGEMENT LP, as follows:

1.   Awarding actual damages in an amount to be determined at trial;

2.   Awarding punitive or exemplary damages on the basis of Defendant's willful, malicious and intentional conduct;

3.   Awarding pre- and post-judgment interest;

9671323v.1

4.      Awarding attorneys' fees and costs;

5.      Permanently enjoining KLM from: (i) utilizing SAF's confidential information; and (ii) soliciting or attempting to solicit any business from any of SAF's customers or prospective customers, or soliciting or enticing any customer of SAF to discontinue, terminate, cancel or revoke its contractual relationship with SAF; and (iii) unwinding KLM's unlawful presence in the ISA marketplace until such time as the contractually agreed upon period has expired; and,

6.      For such other relief as this Court deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a jury trial on all issues so triable as raised by this Complaint.

Dated:  March 18, 2019
        New York, New York

                    Yours, etc.

        WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

                By:  /s/ William Cusack
                    William Cusack
                    Stephen Barrett
                    Attorneys for Plaintiff
                    150 East 42nd Street
                    New York, New York 10017
                    Phone: (212) 490-3000
                    Fax: (212) 490-3038
                    File No. 21708.00001