UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STUDENT ADVANTAGE FUND I LLC,

Plaintiff,

-against-

KENNEDY LEWIS MANAGEMENT LP,

Defendant.

**DECLARATION IN SUPPORT**

Civil Action No.: 19-cv-02401

**DECLARATION OF JEFFREY GROEBER**

I, JEFFREY GROEBER, declare and state, under the penalty of perjury, as follows:

1.      I am an officer of Plaintiff STUDENT ADVANTAGE FUND I LLC ("SAF"), and I am familiar with the allegations contained in SAF's Complaint against KENNEDY LEWIS MANAGEMENT LP ("KLM"). I make this declaration, based on my personal knowledge, in support of SAF's Order to Show Cause for Preliminary Injunction.

2.      SAF was formed in October 2017 to engage in the business of researching, identifying, and selecting Income Share Agreement ("ISA") investment opportunities for its clients.

3.      An ISA is a financial contract in which an individual or organization provides an educational course or degree to a student who, in exchange, agrees to pay back a fixed percentage of his/her income for a fixed number of years with a reasonable and predetermined payment cap.  SAF has developed a proprietary business model wherein ISAs are utilized as an alternative to the traditional student loan system for higher education, delivering a method of education funding that maximizes efficiency and minimizes risk for students and educational institutions.

4.      Prior to October 26, 2017, in connection with its proprietary business model, SAF

1

6081777v.1

identified a number of potential clients, had already executed an ISA financing agreement with one such client (i.e. Redacted ), and was actively engaged in discussions with many additional clients with the aim of expanding SAF's reach to the entire post-secondary education industry, as well as other business use cases in other industries.

5.     SAF began to seek out investors in mid-October 2017 and, through a mutual acquaintance, SAF was introduced to KLM as a potential investor.

6.     An initial meeting between SAF and KLM was held on October 26, 2017 at KLM's offices in downtown New York.  I attended on behalf of SAF, and KLM was represented by Darren Richman and David Chene.

7.     During the October 26, 2017 meeting, I explained the general structuring of ISAs, and it was apparent that the entire concept of ISAs was completely novel to Mr. Richman and Mr. Chene.

8.     KLM expressed immediate interest in acting as SAF's investment partner and capital provider.

9.     In response to KLM's interest, I emailed KLM a proposed Confidentiality & Non-Circumvention Agreement on the evening of October 26, 2017.  In my October 26, 2017 email, I indicated that SAF would only share its proprietary data and details of its business upon execution of the proposed Confidentiality & Non-Circumvention Agreement.  A copy of the October 26, 2017 email is annexed hereto as Exhibit A.

10.    In response to my October 26, 2017 email, Mr. Richman responded on behalf of KLM in an email dated October 27, 2017.  In his email, Mr. Richman commended SAF on "seeing this [ISA] opportunity," expressed that KLM was "look[ing] forward to seizing on [the opportunity] with [SAF]", and indicated that KLM would "sign the NDA today."  A copy of

2

KLM's October 27, 2017 email is annexed hereto as Exhibit A.

11. The Confidentiality & Non-Circumvention Agreement was ultimately fully executed on October 27, 2017. A true and complete copy of the Confidentiality & Non-Circumvention Agreement is annexed to hereto as Exhibit B.

12. In reliance on the Confidentiality & Non-Circumvention Agreement's confidentiality and non-circumvention terms, I revealed SAF's proprietary trade secret information to KLM in order to enable KLM to assess the value of its potential investment in SAF.

13. In particular, I disclosed SAF's proprietary business model, its existing customer list, its list of targeted customers, and its proprietary research about the ISA marketplace which identified potential business partners and competitors. An exemplar collection of emails and spreadsheets exchanged between SAF and KLM in November 2017 disclosing SAF's trade secret information, including customer lists and competitors, is collectively annexed hereto as Exhibit C.

14. As shown in Exhibit C, SAF disclosed its targeting and valuation of, as well as market research for, clients and prospective clients such as Redacted, Redacted Redacted. SAF also revealed its marketing strategies for each of these clients, and disclosed Vemo Education as its primary competitor in the ISA marketplace.

15. In addition, on December 2, 2017, I provided KLM with a deal summary containing additional proprietary information, including client lists. A copy of the December 2, 2017 deal summary is annexed hereto as Exhibit D.

16. As shown in Exhibit D, SAF disclosed additional market research and proposed

3

6081777v.1

deal structures for clients and prospective clients such as Redacted ,
Redacted .

17.     In addition to the items attached hereto as Exhibits C and D, I also provided KLM with "pitch decks", additional financial models, and proprietary deal structures, and explicitly explained to KLM how to successfully pitch ISAs in the higher education marketplace.  I also disclosed Redacted to KLM as a prospective client.

18.     All of the foregoing items were exchanged with KLM pursuant to the Confidentiality & Non-Circumvention Agreement with the expectation that they would be kept in strict confidence and used only for KLM to assess a potential investment in SAF.  Instead, KLM used this information to raise funds for explicit use in an ISA investment strategy in direct competition with SAF.  It is my understanding that this ISA investment strategy is clearly stated in KLM's current fund documents.

19.     Throughout the time period when I was disclosing SAF's proprietary information to KLM, KLM repeatedly misrepresented material facts to me, including that KLM would: (i) keep SAF's information confidential; (ii) not circumvent SAF to compete directly with SAF in the ISA marketplace; and (iii) not contact or communicate with the SAF's clients and prospective clients.

20.     KLM also represented to me that it needed voluminous due diligence items in order to assess its potential investment in SAF. In reliance on these representations, I continued to provide KLM with more and more detailed materials about SAF's business model, strategies, and clients throughout late-2017 and early-2018.

21.     Based on my conversations with KLM's principals and employees, it is my understanding that KLM's current understanding of the ISA marketplace was obtained entirely

4

6081777v.1

through my disclosure of SAF's proprietary trade secret information to KLM—such disclosures being made at all times with the expectation that KLM would use this information solely to vet a potential investment in SAF.

22.    KLM never invested in SAF.

23.    Rather, KLM circumvented SAF and approached SAF's clients and prospective clients, and developed a business relationship with SAF's primary competitor (i.e. Vemo Education) in furtherance of its efforts to circumvent SAF.

24.    I am currently aware that KLM has usurped at least one prospective client away from SAF, i.e. Redacted.

25.    I am also currently aware that KLM has engaged with at least one other client (i.e. Redacted) using a proposed financing term sheet that is based directly on a proprietary deal structure disclosed to KLM by me regarding this very client.

26.    It is my understanding that KLM has also approached SAF's existing client Redacted, as well as additional prospective clients such Redacted and Redacted Redacted.

27.    If KLM is permitted to continue to utilize SAF's confidential, proprietary, and trade secret information, SAF will continue to be harmed by the Defendant's unfair and unlawful competition in the marketplace.  It is simply impossible for SAF to quantify the harm done by the loss of even one client or potential client caused by KLM's improper and ongoing disruption of the ISA marketplace.

28.    After becoming aware of KLM's violation of the Confidentiality & Non-Circumvention Agreement and ongoing use of SAF's trade secrets in January 2019, SAF retained counsel.  On January 29, 2019, SAF's counsel sent a letter to KLM reminding KLM of

5

its obligations under the Agreement, and directing KLM to cease any and all violation of the Confidentiality & Non-Circumvention Agreement. In response, on January 30, 2019, KLM attempted to contact another of SAF's prospective clients in direct violation of the Confidentiality & Non-Circumvention Agreement.  SAF's counsel sent a second letter to KLM on January 30, 2019 advising that SAF considered this continued outreach to SAF's prospective clients to represent a further breach of the Confidentiality & Non-Circumvention Agreement.  On February 6, 2019, KLM responded to SAF's counsel's letters by indicating that KLM did not intend to cease its infringing conduct.  Copies of the letters exchanged between the SAF's and KLM's attorneys are annexed hereto as Exhibit E.

I declare under penalty of perjury that the foregoing is true and correct.

_____

JEFFREY GROEBER

6

6081777v.1